Calvin **WILLIAMS**, Gilberto Gerena Valentin, Salvador Cartagena, Midge Brown, Felix Berrios, and Antonio Martinez, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Salvatore **SCLAFANI**, Herbert J. Feuer, Alice Sachs, Charles A. Avarello, Elrich A. Eastman, Elizabeth A. Cassidy, Matteo Lumina, Joseph J. Previte, Anthony Sadowski, and James Bass, Commissioners of the Board of Elections in the City of New York, as Members of, and constituting, the said Board of Elections, Defendants,

State of New York, Ramon S. Velez, Stephen Kaufman, and Hon. Mary Pinkett, Intervenor-Defendants.

No. 77 Civ. 4355.

United States District Court, S. D. New York.

Jan. 24, 1978.

John C. Klotz, New York City, for plaintiffs Gilberto Gerena Valentin, Felix Berrios and Antonio Martinez; Michael R. Lanzarone, New York City, Robert Schmukler, Brooklyn, N. Y., of counsel.

W. Bernard Richland, Corp. Counsel, New York City, for Bd. of Elections in the City of New York; Gary R. Tarnoff, Leonard Koerner, Patrick F. X. Mulhearn, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for intervenor-defendant State of New York; Francis R. Angelino, George D. Zuckerman, New York City, of counsel.

Bleifer & Yalkut, P. C., New York City, for intervenor-defendant Ramon S. Velez; Paul E. Bleifer, Theodore E. Teah, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

On November 18, 1977, a three-judge court granted summary judgment for defendants on the Voting Rights Act claim of plaintiffs Gilberto Gerena Valentin ("Valentin") and Felix Berrios ("Berrios") and granted plaintiffs leave to file a second amended complaint adding a § 1983 claim and another plaintiff, Antonio Martinez ("Martinez"). Plaintiffs Valentin, Berrios and Martinez and intervenor-defendant Ramon S. Velez ("Velez") now cross-move for summary judgment on the § 1983 claim. For the reasons hereinafter stated, plaintiffs' motion for summary judgment is granted and Velez' cross-motion is denied.

### FACTUAL BACKGROUND [1]

When this action was commenced, intervenor-defendant Velez was the Democratic

---

1. The only factual matter in dispute is as to what issues and claims were raised and adjudicated in the state courts. See the 9(g) statements submitted by the parties.

incumbent New York City Councilman representing the 11th Councilmanic District in the South Bronx. He and plaintiff Valentin vied for the Democratic nomination for that position on the November 8, 1977 ballot by running in the primary election held on September 8, 1977. As a prerequisite to placement on the primary ballot, the candidates had to make a minimum showing of voter support. The showing required in this case was 1500 signatures on designating petitions. The period for collecting these signatures was June 7, 1977 to July 7, 1977.

Sometime prior to the signature-gathering period, plaintiff Valentin communicated with the Board of Elections in the City of New York ("the City Board of Elections" or "City Board") to inquire whether persons registering on the street pursuant to New York's recently enacted mail registration statute, New York Election Law § 153 (McKinney Supp.1976), could simultaneously sign his designating petitions. It is undisputed that he was informed by Ms. Betty Dolen, Executive Director of the City Board of Elections, that street registrants could validly sign a designating petition so long as the registration was stamped in at the City Board of Elections on or before receipt of the designating petition at the City Board. There is also no dispute that Ms. Dolen was convinced that she was giving the correct interpretation of what was permissible under the new mail registration

statute and, accordingly, she consistently gave this advice to whoever inquired about petition-gathering.[2] This advice was also given to candidates, including Valentin, by Ms. Beatrice Berger, Chief Clerk of the Bronx Office of the City Board of Elections.[3]

Valentin followed the instructions of the City Board of Elections with respect to simultaneous signing of mail registrations and designating petitions, collected more than the required 1500 signatures, and submitted the designating petitions to the City Board. On August 1, 1977, the City Board by formal resolution validated Valentin's designating petitions over the objection of Velez that the 343 signatures of street registrants should be invalidated because they "signed before registration" ("SBR's").

A number of suits were thereupon commenced in New York State Supreme Court by various candidates challenging *inter alia* the validity of SBR's. On or about August 5, 1977 the City Board of Elections changed its position on the validity of SBR's after being advised by the State Board of Elections that its earlier position was erroneous.[4] Thereafter, on August 22, 1977, a Justice of the State Supreme Court invalidated the 343 SBR's on Valentin's designating petitions. *Velez v. Board of Elections and Valentin*, Index No. 14399/77 (Sup.Ct., Bx. Co.). That brought Valentin below the 1500 required signatures; the State Court

---

For a fuller development of the facts, see the November 18, 1977 decision of the three-judge court.

The parties submitted numerous briefs and affidavits throughout this action, all of which were considered in connection with the present motions.

**2.** *See* August 12, 1977 Testimony of Betty Dolen before Referees Paperno and Stackell in connection with *Salmon v. Board of Elections and Klotz*, Index No. 14421/77 (Sup.Ct., Bx. Co.); *e.g.*, Affidavit of Frank Baraff, dated October 7, 1977. Ms. Dolen's conviction was based on an "impression" formed on the basis of a telephone conversation she allegedly had a year earlier with someone from the State Board of Elections. She could not recall specifically with whom she had spoken other than that it would have been somebody who normally explained Board rulings and might have been

"the Executive Director or the Deputy Executive Director, or counsel . . . ." *Id.* at 25.

Stanley Zalen, Deputy Counsel for the New York State Board of Elections, in an affidavit dated September 17, 1977, states that "[t]he only instructions given by the New York State Board of Elections to be officially relied upon are issued in the form of written rules and regulations, written opinions, or written advisories. No official communications are ever given orally."

**3.** *See* Report of Special Referee Lloyd I. Paperno, dated August 22, 1977, in connection with *Salmon v. Board of Elections, supra* at 8–9; Affidavit of Valentin, dated September 11, 1977.

**4.** Testimony of Betty Dolen, *supra* at 28, 31.

therefore directed that Valentin's name be removed from the primary ballot.[5]

The State Court's decision regarding the SBR's was based on its adoption of the report of Special Referee Lloyd I. Paperno. That report had concluded that the interpretation of the mail registration statute which Dolen and Berger had been publicly disseminating "would not be binding upon the court in any event inasmuch as they pertain to the interpretation of the statute."[6] Similarly, in the related case of *Cartagena v. Board of Elections*, Index No. 14489/77 (Sup.Ct., Bx. Co.), Justice William P. McCooe concluded, in a decision dated August 22, 1977, that the oral opinion of the Executive Director of the City Board of Elections was of no force and effect for two reasons. First, he concluded that the oral advice was inconsistent with Sections 153(7)[7] and 135[8] of the New York Election Law which he construed to require that the signatory actually be enrolled as a voter at the time of signing the designating petition. Second, he concluded that the oral advice, in addition to being wrong, was unauthorized because only the *State* Board of Elections is authorized to make regulations[9] and such regulations have force and effect only when written and filed with the Secretary of State.[10]

On August 25, 1977, the Appellate Division, First Department, unanimously affirmed without opinion the Supreme Court

determination. The New York Court of Appeals denied leave to appeal on August 30, 1977. Valentin has filed a notice of appeal to the United States Supreme Court.

On September 2, 1977, this Court signed a temporary restraining order requiring the City Board to reinstate Valentin on the ballot pending a determination of plaintiffs' motion for a preliminary injunction under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c. Pursuant to 28 U.S.C. § 2284(b)(3), the temporary restraining order remained in effect until the Voting Rights Act claim was disposed of by the November 18, 1977 three-judge court decision. On November 4, 1977 Velez brought on an order to show cause why the November 8th election should not be stayed pending the disposition by the three-judge court. Believing that the probabilities of success and the equities favored plaintiffs, the court denied the stay in accordance with an oral decision rendered that date. Four days later, on November 8, 1977, Valentin was elected to the City Council by a landslide. He assumed office on January 1, 1978.

### SECTION 1983 CLAIM

▬ It is well settled that voting is a fundamental right, *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), which includes the right to vote in a primary election, *Smith v. Allwright*, 321 U.S. 649, 660–62, 64 S.Ct. 757, 88 L.Ed. 987

---

**5.** Velez has argued that even if this Court concludes that for due process reasons the SBR's must be counted, Valentin should be denied relief because some of those signatures were allegedly tainted by fraud. In furtherance of this argument, Velez has submitted form affidavits from some SBR's to the effect that when they signed the designating petitions they did not do so with the intention of putting Valentin on the ballot. One of the implications of these affidavits is that there was some deceit involved in Valentin's procurement of the signatures of these SBR's. This non-federal issue was raised in the state courts and will not be reconsidered here. Similarly, the Court will not consider the affidavits attacking the residency of a handful of SBR's as that is clearly a state court issue.

**6.** The Paperno Report was also adopted by Justice William P. McCooe in the related case

of *Salmon v. Board of Elections and Klotz, supra.*

**7.** Section 153(7)(a) of the Election Law (McKinney Supp.1976) provides: "The voter registration, enrollment and transfer of registration, shall be complete upon receipt of the application by the appropriate county board of elections . . . ."

**8.** Section 135(2) of the Election Law (McKinney Supp.1976) requires a signatory of a designating petition to swear that he is a "duly enrolled voter."

**9.** *See* Election Law §§ 469 and 470 (McKinney Supp.1976).

**10.** *See* Executive Law § 102 (McKinney 1972 and 1976 Supp.).

(1944); *United States v. Classic*, 313 U.S. 299, 318, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); *cf. Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), and to have that vote counted, *Gray v. Sanders*, 372 U.S. 368, 380, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); *United States v. Classic, supra; cf. Hadley v. Junior College District of Metropolitan Kansas City*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970). A voter has standing to sue for deprivation of that right. *Gray v. Sanders, supra*, 372 U.S. at 375, 83 S.Ct. 801; *Griffin v. Burns*, 431 F.Supp. 1361, 1363 (D.R.I.1977) (implied).

Likewise, the first amendment rights of freedom to associate and to petition for redress of grievances and the concept of liberty in the due process clause of the fourteenth amendment provide candidates with a limited right of access to the ballot. *See Smith v. Cherry*, 489 F.2d 1098, 1100 (7th Cir. 1973), *cert. denied*, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974); *Briscoe v. Kusper*, 435 F.2d 1046, 1052–54 (7th Cir. 1970). Thus, the right to appear on the ballot is integral to the right to vote and must be measured by the same test of constitutionality. *See Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). Candidates have standing to assert this right. *See Smith v. Cherry, supra* and *Briscoe v. Kusper, supra* (implied in both cases).

Here plaintiffs allege in their second amended complaint that these rights of voters and candidates were abridged without due process in that Valentin justifiably relied on the advice of the City Board of Elections and as a result was affirmatively misled into following an unauthorized method of signature gathering. He was not given notice of the appropriate procedure until after the petition-gathering period had ended. Consequently, he was unconstitutionally denied access to the ballot, and, in turn, the voters were unconstitutionally denied the right to vote for him.[11]

In support of their legal theory, plaintiffs rely primarily on *Briscoe v. Kusper, supra*, and *Griffin v. Burns, supra*. In *Briscoe*, the governing statute provided that " 'Each voter signing a nomination paper . . . may subscribe to one nomination . . . *and no more*. . . .' " *Id.* at 1054 (emphasis added). Nonetheless, the Board of Elections had followed a custom of permitting voters to sign more than one nominating petition. "In 1967, seemingly for the first time, the Board voted 2–1 to change its position and sustain objections to signatures on the duplication ground" without giving prior warning to potential candidates. *Id.* at 1055. The Seventh Circuit held that

> [r]egardless of whether the more restrictive position of the Board was statutorily or constitutionally valid, the application of the new anti-duplication rule to nullify previously acceptable signatures without prior notice was unfair and violated due process. . . . An agency may be bound by its own established custom and practice as well as by its formal regulations. The Board may not deviate from such prior rules of decision on the applicability of a fundamental directive without announcing in advance its change in policy. This is especially true where, as here, fundamental, constitutionally protected liberties are adversely affected, and those interested require certain knowledge of what is expected of them by the state. Until such time as the Board makes public its new determination, it is constitutionally prohibited from imposing that rule on unsuspecting persons. *Id.*[12]

*Briscoe* resembles this case since here too the City Board of Elections had adopted a custom not in literal compliance with the governing statute and thereby induced the uncontroverted reliance of poten-

---

11. *See* ¶¶ 14, 16–20, 47–50 of the Second Amended Complaint.

12. In accordance with the reasoning in *Briscoe*, this Court, too, finds *Snowden v. Hughes*, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944), inap-

plicable and Velez' reliance thereon misplaced inasmuch as plaintiffs' grievance involves the loss of constitutionally-protected, not state-created, rights.

tial candidates.[13] Velez would have this Court bypass the dispositive issue of the potential candidates' reliance and instead look to the reliance *vel non* of the voters. To that end he submitted form affidavits from some of Valentin's SBR's in an attempt to prove that a critical percentage of the SBR's did not intend to rely on the oral advice of the City Board of Elections. The voters' rights were abridged, however, not by their individual or collective acts of reliance, but by the reliance of Valentin, which resulted in the infringement of Valentin's rights and, in turn, the rights of those voters who wished to support him.[14] Accordingly, the affidavits submitted by Velez will not be considered.

■ Reliance having been established, the Court finds the reliance to have been justifiable inasmuch as the City Board of Elections by virtue of its position had apparent authority to speak, notwithstanding its lack of actual authority to do so, and its advice was not so patently erroneous as to put the inquirer on notice that he should not follow the advice. Thus, even though the advice was erroneous and unauthorized, this Court believes that, as in *Briscoe*, there was a custom or practice, which induced justifiable reliance, and could not be departed from without giving prior notice to potential candidates.

Unlike *Briscoe*, however, the change in procedure in this case apparently was an immediate consequence of judicial invalidation of an administrative practice, rather than a direct result of a change within the administrative agency itself. That is not to say, however, that *Briscoe* is inapposite and the City Board's conduct immune from attack. On the contrary, although a judicial decision was the immediate cause of Valentin's removal from the ballot, the City Board of Elections was directly responsible for this result. In the wake of a new mail registration statute designed to facilitate greater enrollments, it was entirely reasonable for candidates to call the City Board of Elections to try to determine whether the petition-gathering procedure had been affected by the new registration procedures. It was the duty of the Executive Director of the City Board of Elections to obtain a correct interpretation of the statute and not disseminate interpretations that were incorrect. It was the duty of the Executive Director of the City Board of Elections to know and follow proper rule-making procedures, to know the limits of her authority and not to hold herself out as having authority she lacked. The burden was on the Board, not the potential candidate, to look into these matters further or at least to warn inquirers that they could not rely on advice given them. When the Board breached these duties it set the stage for the invalidation, after the time for signature-gathering had closed, of petition signatures garnered on its advice. But for the conduct of the City of Board of Elections, Valentin undoubtedly would not have followed this improper procedure, would not have had the 343 SBR's invalidated, and would not have had his candidacy invalidated. In addition, but for the City Board's recklessness, those who signed his petitions, including the non-SBR's would not have been disenfranchised and those 4800 people who voted for him in the primary on September 8th would not have been faced with

**13.** In opposition to Valentin's affidavit regarding reliance, Velez argues that Valentin himself did not rely since he did not personally collect signatures. Points and Authorities of Defendant Velez in Opposition to Summary Judgment in Favor of Plaintiffs, And in Support of Summary Judgment in Favor of Defendant Velez at 16. This argument is frivolous.

**14.** Similarly, the Court regards as collateral whether each of the SBR's voted in both the primary and the election and, if so, for whom they voted. It is clear that Valentin's campaign relied on the advice given, and thereby obtained a sufficient number of signatures to qualify for the primary ballot, and as a result, won the primary with 4800 voters casting their ballots for him. It is the bottom line that counts, not the state of mind of each SBR on the day he or she signed the designating petition, on primary day and on election day. Consequently, the affidavits of Cesar Nieves and Ada Torres and the opposing affidavit of Peter Vera are irrelevant. Moreover, if the issues raised by these affidavits were relevant, it would seem that better evidence could be obtained than affidavits from unidentified affiants.

the threat of disenfranchisement by this Court now. Accordingly, the Court believes that *Briscoe* is applicable.

This Court is not alone in so holding. *Griffin v. Burns, supra,* which is on all fours with this case, reached the same result. In *Griffin,* "[p]ursuant to a custom reaching back for at least seven years, and in accordance with its understanding of the requirements of state law . . . the Board of Canvassers issued applications to qualified voters to obtain absentee or shut-in ballots." *Id.* at 1363. The Board validated the absentee and shut-in ballots cast and as a result candidate Griffin won the primary by 15 votes. The losing candidate sued in state court on the ground that state law permitted absentee and shut-in ballots only in general elections. The court agreed, holding that there was no constitutional or statutory basis for the Board's permitting absentee and shut-in votes in primary elections. The *court* therefore quashed the Board's certification of Griffin. Thereafter, the class of voters whose absentee and shut-in votes had been invalidated brought a § 1983 suit against the Secretary of State, three members of the Board of Canvassers and one of candidate Griffin's opponents.

█ As in the instant case, there was no evidence that defendants had any discriminatory intent and the court found that defendants had acted in good faith in issuing and counting the absentee and shut-in ballots. *Id.* at 1364.[15] Nonetheless, following *Briscoe,* the Court found a § 1983 violation, reasoning that

In this case, plaintiffs who attempted in good faith to exercise that right find—through no fault of their own, and in reliance on the representations of state officials—that they have somehow "lost" that right. As the Court noted in its May 2 Order, "something fundamentally unfair has taken place." It is hard to see how this sudden loss of the franchise after it has been exercised by voters unquestionably qualified to exercise it comports either with the right to an undiluted vote, *Reynolds v. Sims,* 377 U.S. 533, 562–68, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Gray v. Sanders,* 372 U.S. 368, 380, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), or with due process of law.

. . . . .

In this case, state officials have in effect presented the plaintiff class with "illegal ballots" and then have refused to count their votes. The right to vote has clearly been infringed. In this context of significant disenfranchisement of an identifiable group at the direction of state officials, the lack of evil intent on the defendants' part is not dispositive. *Toney v. White,* 488 F.2d 310 (5th Cir. 1973); *Coalition for Education, District One v. Board of Elections,* 370 F.Supp. 42 (S.D. N.Y.1974), aff'd 495 F.2d 1090 (2nd Cir. 1974); *Ury v. Santee,* 303 F.Supp. 119 (N.D.Ill.1969). *Id.* at 1366.

Plaintiffs' proof brings them within the ambit of *Briscoe* and *Griffin.* Velez' oppo-

---

**15.** Plaintiffs need not prove that defendants acted with specific intent to deprive them of their constitutional rights. *See Wood v. Strickland,* 420 U.S. 308, 321–22, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Hennings v. Grafton,* 523 F.2d 861, 865 (7th Cir. 1975) ("lack of intent to violate plaintiffs' constitutional rights would not necessarily be a defense if the defendants should have known that their conduct would have that effect"); *Coalition for Education in District One v. Board of Education,* 370 F.Supp. 42, 55 (S.D.N.Y.), aff'd per curiam, 495 F.2d 1090 (2d Cir. 1974). Velez suggests that the defendants are not "persons" within the meaning of § 1983 and that the Justices of the State Courts are necessary parties and therefore should have been

joined. Inasmuch as the members of the City Board of Elections are sued individually and as an entity there is no problem as to whether plaintiffs have sued a "person" within the meaning of § 1983. *Cf. Monell v. Dep't of Social Services of the City of New York,* 532 F.2d 259, 263–64 (2d Cir. 1976), *cert. granted,* 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977). Similarly, whether the intervenor-defendant State of New York is immune is irrelevant since the relief runs against the members of the City Board of Elections. Likewise, the Court finds unpersuasive Velez' suggestion that the Justices of the New York courts are necessary parties. It is not the State courts' action which is at issue here. Moreover, as in Griffin, the State's interest has been commendably represented by the Attorney General.

sition does not raise a genuine issue of material fact as to the existence of an administrative "practice," albeit an unauthorized one, the potential candidates' justifiable reliance thereon, and the resultant infringement of the rights of candidates and voters. Accordingly, absent some legal objection, summary judgment in plaintiffs' favor would be in order. The Court now turns to the legal objections raised by Velez.

### Velez' Objections

Velez' primary objection, and the basis for his cross-motion for summary judgment, is that res judicata, collateral estoppel and full faith and credit bar plaintiffs from pursuing their § 1983 claim.[16] This Court disagrees.

 Res judicata applies in § 1983 cases only when the claims asserted in the civil rights suit are identical to those raised in the state court proceedings. *E. g., Graves v. Olgiati*, 550 F.2d 1327 (2d Cir. 1977) (Kaufman, C. J.) (not identical—no res judicata); *Newman v. Board of Education*, 508 F.2d 277 (2d Cir.) (per curiam), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1447, 43 L.Ed.2d 762 (1975) (same claim raised, but not developed, in state courts—no res judicata); *Thistlethwaite v. City of New York*, 497 F.2d 339 (2d Cir.), *cert. denied*, 419 U.S. 1093, 95 S.Ct. 686, 42 L.Ed.2d 686 (1974) (identical—res judicata); *Perrotta v. Irizarry*, 430 F.Supp. 1274, 1277–78 (S.D.N.Y.),

*aff'd on the opinion below*, No. 77–7254 (2d Cir. Dec. 19, 1977) (not identical—no res judicata); *DeLuca v. Starck*, 414 F.Supp. 18 (E.D.Wis.1976) (not identical—no res judicata). In the instant case, however, the constitutional claim raised by Valentin in the State courts is not identical to the constitutional claim at bar. Although Salvador Cartagena[17] orally argued reliance/due process before State Supreme Court Justice McCooe,[18] Valentin did not allege or argue a denial of due process.[19] Rather, the sole constitutional claim made by Valentin in the State courts was that § 136 of the Election Law would be unconstitutional unless there were a compelling state interest for interpreting it as the lower court had done; and there could be no compelling state interest inasmuch as a less restrictive interpretation was permitted in Community School Board Elections. It is unnecessary for this Court to decide whether Valentin can be charged with having joined in the "due process claim" asserted by Cartagena, because Cartagena's "claim" was not adjudicated by the state courts; therefore, there is no res judicata. *Olson v. Board of Education*, 250 F.Supp. 1000, 1005 (E.D.N.Y.), *appeal dismissed per curiam as moot*, 367 F.2d 565 (2d Cir. 1966); *see Morpurgo v. Board of Higher Education*, 423 F.Supp. 704, 710 (S.D.N.Y.1976) (Weinfeld, J.) (plaintiff "is barred from renewing only those claims specifically raised *and passed upon* by the state courts.") (emphasis added; footnote omitted).

---

**16.** Velez also argues that due to alleged voting irregularities on primary day other voters were disenfranchised. These alleged voting irregularities are in no way relevant to the issue at hand. Velez does not claim that he too was denied due process; nor can he under the facts he alleges. *See Hennings v. Grafton*, 523 F.2d 861 (7th Cir. 1975). Rather, these irregularities are purely a matter for the state courts, where they in fact were litigated and decided adversely to Velez: the state courts denied Velez' petition to set aside the official canvass of the City Board of Elections on grounds of alleged voter irregularities on primary day. *Velez v. Sclafani*, Index No. 15510/77 (Sup.Ct., Bx. Co., Oct. 25, 1977), adopting Report of Special Referee William K. Broudy, dated October 21, 1977, *unanimously affirmed without opinion*, 399 N.Y.S.2d 159, No. 1211 (App.Div., 1st Dep't, 1977).

**17.** Cartagena was another City Council candidate who was removed from the ballot by the state courts when his SBR's were invalidated. He was a plaintiff in this action and was reinstated on the ballot by this Court's temporary restraining order, but his interest was mooted by his defeat in the September 8th primary.

**18.** *See* pp. 11–14 of Transcript of the August 22, 1977 argument of Louis C. Benza on behalf of Cartagena, before Justice McCooe, in *Cartagena v. Board of Elections*, Index No. 14489/77.

**19.** *See* Transcript of the August 22, 1977 argument of John C. Klotz on behalf of Valentin, before Justice McCooe, in *Velez v. Board of Elections*, Index No. 14399/77.

Nor is Valentin precluded from seeking relief in federal court because he did not raise the instant due process claim in the state court proceedings. In this Circuit, res judicata does not apply in § 1983 suits with respect to claims that could have been but were not raised in the prior state suit. *Lombard v. Board of Education*, 502 F.2d 631 (2d Cir. 1974), *cert. denied*, 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975); *accord, Newman v. Board of Education, supra; Morpurgo v. Board of Higher Education, supra.* This exception to the res judicata doctrine in civil rights suits is based in part on the policy that § 1983 relief was intended to be supplemental to state relief and that plaintiffs should be able to utilize both federal and state forums when one cause of action gives rise to state and federal claims. *Lombard, supra* at 635–36. Similarly, to effectuate this policy, civil rights plaintiffs are not required to exhaust their state judicial remedies. *McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Lombard, supra* at 635–36.[20] Therefore, plaintiffs are not barred by their failure to raise the instant claim in state court.

As to collateral estoppel, this applies only when an issue raised in the second action was actually litigated and was necessary to the determination in the first action. *Lombard, supra* at 637; 1B J. Moore, *Federal Practice* ¶ 0.405[1] (2d ed. 1965); *see Note*, Developments in the Law—Section 1983 and Federalism, 90 *Harv.L.Rev.* 1133, 1333 (1977). Thus, if the validity of the SBR's under state law were an issue here, there would be collateral estoppel on that issue; however, the state court determination that the SBR's were invalid is not relevant to the instant question of whether or not the City Board of Elections' erroneous advice and *ultra vires* conduct led to a denial of due process. Similarly, if the state courts had found, or if the determinations necessarily implied a finding, that there had been no justifiable reliance by the candidates and voters, then there would be collateral estoppel on that issue; however, contrary to Velez' repeated assertion, the state courts neither expressly nor impliedly determined that issue.[21]

**20.** *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 609 n.21, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), expressly is not to the contrary.

**21.** Velez cites as evidence of a finding on reliance the language of Justice McCooe in *Cartagena v. Board of Elections*, Index No. 14489/77 (Sup.Ct., Bx. Co., Aug. 22, 1977), that the oral opinion of the Executive Director of the City Board of Elections was of no force and effect. It is clear, however, that Justice McCooe was passing only on the legal validity of the practice under New York law and was not making a finding concerning reliance; nor is a finding concerning reliance necessarily implied in Justice McCooe's holding, inasmuch as reliance was not relevant to the statutory validity of the City Board's conduct under New York law.

Nor is such a finding necessarily implied in the fact that Justice McCooe may have implicitly rejected applying equitable estoppel, not because of lack of reliance, but apparently because he believed that equitable estoppel is still not available against the government. *See* pp. 26–27 of Transcript of the August 22, 1977 argument of John Klotz on behalf of Valentin, before Justice McCooe, in *Velez v. Board of Elections*, Index No. 14399/77. On the question of equitable estoppel see K. Davis, *Administrative Law of the Seventies* §§ 17.01 and 17.06 (1976); *e. g., LaPorto v. Village of Philmont*, 39 N.Y.2d 7, 382 N.Y.S.2d 703, 346 N.E.2d 503 (1976); *Bender v. New York City Health & Hospitals Corp.*, 38 N.Y.2d 662, 382 N.Y.S.2d 18, 345 N.E.2d 561 (1976); *Planet Construction Corp. v. Board of Education*, 7 N.Y.2d 381, 198 N.Y.S.2d 68, 165 N.E.2d 758 (1960).

Lastly, in an attempt to demonstrate that the New York courts disposed of the issue of reliance Velez submits an affidavit from his attorney who states that he "specifically recalls that at the Appellate Division one of the Justices inquired of Mr. Klotz, attorney for VALENTIN, as to whether he could submit any authority for the proposition that one could rely upon the oral opinion of a representative of the Board of Elections and that oral opinions could be binding when, in fact, they contradicted the then existing statutory law." Affidavit of Paul E. Bleifer, dated November 12, 1977. At oral argument before this Court on November 29, 1977, Mr. Bleifer's co-counsel, Theodore Teah, recollected the Appellate Division Justice's inquiry this way: "The point that was made, I believe, I may be wrong, was something to the effect—are you saying we should allow people to rely upon the advice of a clerk?" (Tr. 40–41)

Therefore, there is no collateral estoppel as to any of the plaintiffs on the reliance issue.[22]

█ Likewise, the Court does not believe that full faith and credit is due under 28 U.S.C. § 1738. This statute requires federal courts to give whatever credit the state would give to the state court decision. However, "[o]ther well-defined federal policies, statutory or constitutional, may compete with those policies underlying section 1738." *American Mannex Corp. v. Rozands*, 462 F.2d 688, 690 (5th Cir.), *cert. denied*, 409 U.S. 1040, 93 S.Ct. 524, 34 L.Ed.2d 489 (1972); *accord, Mitchell v. NBC*, 553 F.2d 265, 274 (2d Cir. 1977); *Red Fox v. Red Fox*, 564 F.2d 361, 365 n.3 (9th Cir. 1977); *Batiste v. Furnco Construction Corp.*, 503 F.2d 447, 450 (7th Cir. 1974), *cert. denied*, 420 U.S. 928, 95 S.Ct. 1127, 43 L.Ed.2d 399 (1975); *Cullen v. New York State Civil Service Commission*, 435 F.Supp. 546, 555–56 n.5 (E.D.N.Y.1977); *Wageed v. Schenuit Industries Inc.*, 406 F.Supp. 217 (D.Md. 1975); *Porter v. Nossen*, 360 F.Supp. 527 (M.D.Pa.1973), *aff'd without opinion*, 511 F.2d 1395 (3d Cir. 1975). It would appear that the same policies which favor a relaxed principle of res judicata in § 1983 suits, *see Lombard, supra*, would also militate against giving full faith and credit here.[23] *See Cullen v. New York State Civil Service*

---

Even apart from the fact that counsels' assertions are based on unrecorded recollection, the Court does not believe that such an inquiry of one of the Justices can be treated as a finding of non-reliance or unjustified reliance. In § 1983 suits, "if a reasonable doubt as to applicability of the estoppel exists, it must be resolved against precluding litigation of the issue." *Clark v. Lutcher*, 436 F.Supp. 1266, 1272 (M.D.Pa.1977).

22. Velez contends that there should be collateral estoppel against the voters even though they were not parties and, according to Velez, were not entitled to be parties to a state suit brought under § 330 of the Election Law. The reason the voters should be barred, contends Velez, is because their interest supposedly was protected, first, by a group known as the Committee on Vacancies, and second, by Valentin himself. Although Velez asserts that the Committee on Vacancies was a group named by Valentin's supporters to act on their behalf, he does not establish or even suggest that the Committee was authorized by the signatories or anyone else to defend Valentin's candidacy against state court challenges. Rather, Velez asserts that the Committee was authorized to act on behalf of the signatories "*in naming a candidate if* the original candidate through death, declination or disqualification is unable to run. . . . ." Points and Authorities of Defendant Velez in Opposition to Summary Judgment in Favor of Plaintiffs, and in Support of Summary Judgment in Favor of Defendant Velez at 10–11 (emphasis added). Moreover, while Velez states that the Committee was named and served in the state court action, *id.* at 11, he does not assert that the Committee actually appeared and defended the signatories' interests. Indeed, the Court notes that the Committee on Vacancies is not listed in any caption contained on any of the state court documents submitted in this action. Thus, the Committee presumably declined the opportunity to defend Valentin. This would not bar the voters now. *Cf. Show-World Center, Inc. v. Walsh*, 438 F.Supp. 642, 648 (S.D.N.Y.1977). In sum, inasmuch as there has been no proof that the interest of the Committee on Vacancies was identical to that of the signatories and voters, or that it was authorized to represent the interests of the signatories and voters, or that it in fact represented the interests of the signatories and voters, the Court believes that it would be contrary to the interests of justice to estop the voters now. *See Jeter v. Kerr*, 429 F.Supp. 435, 438 n.3 (S.D.N.Y.1977); *Olson v. Board of Education*, 250 F.Supp. 1000, 1004 (E.D.N.Y.), *appeal dismissed per curiam as moot*, 367 F.2d 565 (2d Cir. 1966); *cf. Ellentuck v. Klein*, 570 F.2d 414 at 425 (2d Cir. 1978).

Second, Velez contends that the voters should be collaterally estopped because under New York law voters and candidates purportedly are "united in interest" and therefore Valentin was representing the voters' interest. Assuming that whether they are united in interest is in fact the test for whether they are privies for purposes of collateral estoppel, if their interests are so united, why does § 145 of the Election Law give voters the right to file objections and § 330 of the Election Law apparently give those who have previously filed objections a right of action? This separate right of action seems to imply that the state recognizes that the voters' interest may not always be protected by the candidates. In the absence of a more persuasive showing that the voters have actually had their day in court, this Court is not inclined to collaterally estop them.

23. The Court notes that at the present time the state court judgments are not even admissible inasmuch as they lack "the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form." 28 U.S.C. § 1738.

*Commission, supra*, at n.5; *Note*, Developments in the Law—Section 1983 and Federalism, *supra* at 1335 *et seq.*

That is not to say, however, that there is no issue of comity in this case. Although Velez' reliance on the Anti-Injunction Act, 28 U.S.C. § 2283, is misplaced, *Gibson v. Berryhill*, 411 U.S. 564, 573, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), it is still necessary to determine whether *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny, *e. g., Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) and *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), require federal court abstention.

What these recent cases have in common is that lower federal courts enjoined the enforcement of a state statute and in so doing disrupted a prior ongoing state proceeding, initiated by the state, and in which the state court defendant had refused to litigate the constitutionality of the state statutes. This bypass of the state forum denied the state courts the opportunity to give a narrower reading to their own statutes.

However, unlike the situations involved in those cases, the instant suit does not disrupt an *ongoing* state court proceeding. Moreover, unlike those cases the federal plaintiffs here did not completely avoid the state forum or refuse to appeal; rather, they appeared and vigorously litigated throughout the state court system. Thus, there was no avoidance or interruption by which the state courts' ability to address the matter was obstructed or impugned. Furthermore, it is particularly significant that the bypass in *Huffman, Juidice* and *Trainor* denied those state courts the opportunity to construe their respective statutes consistently with the Constitution. This Court, however, has not been called upon to condemn or construe state statutes; nor does it question the statutory construction of the state courts in this case. Thus, the important state judicial function which *Huffman, Juidice* and *Trainor* seek to protect is not involved here.

Furthermore, in considering the important state interests which are involved here, this Court cannot overlook the compelling federal interest in protecting the fundamental right to vote. Those who signed Valentin's petitions, including non-SBR's, and those who would have voted for Valentin in the primary were deprived of this right when Valentin was removed from the primary ballot. These voters, who include a majority of those voting in the Democratic primary, would have remained disenfranchised but for the intervention of this Court. Should this Court abstain now, they would be disenfranchised anew. Accordingly, this Court, though reluctant to interfere, feels compelled to act to prevent the deprivation of such a fundamental federal right.

In addition, although the state and federal proceedings may appear to be at cross-purposes, it is important to remember that both forums in fact share common purposes, namely to protect the integrity of this election and the rights of voters and candidates.[24]

Lastly, as the defendant City Board of Elections argued in the memorandum it submitted on the Voting Rights Act claim, it is important to keep in mind that the very purpose of the requirement of 1500 signatures is to ensure that all candidates placed on the ballot have a minimum number of supporters and therefore are serious contenders. Certainly, now that Valentin has defeated Velez in the primary, polling far in excess of 1500 votes, and handily won the general election on November 8th, it would exalt form over substance to permit the invalidation of his candidacy on the basis of a technical violation which impaired his showing of preliminary support.

---

24. *See* Memorandum of Law on Behalf of the New York City Board of Elections submitted in relation to the Voting Rights Act claim.

For the foregoing reasons, the Court believes that the interests at stake and the posture of this case warrant this Court's intervention.

Having found none of Velez' objections persuasive, summary judgment is granted in plaintiffs' favor.

### RELIEF

The Court believes that the relief that is most equitable and will preserve the integrity of the election and the people's faith in it is to leave undisturbed the results of the September 8th primary and the November 8th general election. This entails entering a permanent injunction against removing Valentin's name from the ballot.

Velez objects to this relief, proposing instead that this Court avoid the problem of inconsistent state and federal court decrees by simply ordering a new primary with Velez as the unopposed candidate and Valentin as a write-in candidate. This Court would readily grant less intrusive relief if it would provide a fair and adequate remedy. However, it should be obvious that the remedy Velez proposes does not protect plaintiffs' rights to have Valentin on the ballot, would frustrate the rights of the majority who voted for Valentin on primary day, and would undermine the integrity of the primary and general elections.

Velez counters that the relief he proposes will protect the rights of certain voters who did not have the opportunity to vote for either candidate on primary day due to the City Board of Elections' inability to respond in every case to this Court's directive. As unfortunate as that "disenfranchisement" is, the fact is that in terms of numbers, in terms of inability to prove who these voters would have voted for [25] and in terms of the excusable conduct which led to those irregularities, cf. Hennings v. Grafton, supra, the extent of that "disenfranchisement" is minimal in comparison to that faced by those who voted for Valentin. In fact, it has been found immaterial by the state courts.[26]

Having rejected Velez' proposal, the only other possible remedy would be to order a new primary and a new petition-gathering period in conformity with the New York courts' authoritative construction of §§ 153(7) and 135 of the Election Law. The Court rejects this alternative, however, because it would appear to be quite expensive and burdensome to the City and candidates and it does not accomplish the objective of avoiding inconsistent court decrees. In addition, as the Court observed when it granted the temporary restraining order, there is only one "September 8th." It realized then that the circumstances on any given election day are unique. A new primary now could not duplicate the turnout and other circumstances that occurred on September 8, 1977. Thus, it would be unfair to subject the September 8th victor to another challenge when the most prejudice Velez can claim is that from August 30 until September 2nd or 3rd he thought he would be unopposed on the primary ballot. Until that time he had had to conduct a campaign and presumably continued to do so after that brief hiatus; and he was the incumbent.

Thus, the only appropriate remedy is the granting of a permanent injunction against removing Valentin's name from the ballot.

It is so ordered.

---

25. *See* Report of Special Referee William K. Broudy, dated October 21, 1977, *adopted in Velez v. Sclafani,* Index No. 15510/77 (Sup. Ct. Bx. Co., Oct. 25, 1977), *aff'd without opinion,* 399 N.Y.S.2d 159, No. 1211 (App.Div. 1st Dep't, 1977).

26. *Id.*